UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| HASTINGS AUTOMOTIVE, INC., a Minnesota corporation, HASTINGS CHRYSLER CENTER, INC., a Minnesota corporation; and DOUGLAS W. ERICKSON, a Minnesota resident, | Case No.: _____ |
| Plaintiffs, | |
| vs. | **VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| KATHLEEN SEBELIUS, in her official capacity as Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; THOMAS PEREZ, in his official capacity as Secretary of the United States Department of Labor; UNITED STATES DEPARTMENT OF LABOR; JACOB LEW, in his official capacity as Secretary of the United States Department of the Treasury; and UNITED STATES DEPARTMENT OF THE TREASURY, | **TRIAL BY JURY DEMANDED** |
| Defendants. | |

_____

Plaintiffs Douglas W. Erickson, Hastings Automotive, Inc., and Hastings Chrysler Center, Inc. (collectively "Plaintiffs"), by and through their counsel, and for their Complaint against Defendants, state and allege as follows:

## INTRODUCTION

1.      In this action, Plaintiffs challenge the mandate from the Department of Health and Human Services ("HHS") under the Patient Protection and Affordable Care

Act ("ACA") requiring employers to provide coverage in a group health plan for all FDA-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity (the "Mandate").

2.     Plaintiffs base their challenge on their sincerely held religious belief that life begins at conception and certain of the FDA-approved contraceptive methods, such as emergency contraceptives Plan B and ella, as well as certain intrauterine devices ("IUDs"), can destroy a human embryo.

3.     Plaintiffs believe that it is immoral and sinful for them to provide a group health plan that includes coverage for such contraceptive methods.

4.     Plaintiffs seek a preliminary and permanent injunction enjoining the challenged mandate and a declaration that the mandate violates federal constitutional and statutory law.  The mandate is unconstitutional on its face and as applied because it violates Plaintiffs' rights to the free exercise of religion and free speech under the First Amendment to the United States Constitution, violates the establishment of religion prohibition of the First Amendment to the United States Constitution, violates equal protection and due process provisions of the Fifth Amendment to the United States Constitution, and violates the Religious Freedom Restoration Act.

**THE PARTIES**

5.     Plaintiffs Hastings Automotive, Inc. and Hastings Chrysler Center, Inc. (the "Dealerships") are privately owned automotive dealerships located in Hastings, Minnesota.  The Dealerships share common ownership sufficient to establish a

controlled-group for purposes of application of the Affordable Care Act.  Between them, the Dealerships employ approximately sixty (60) full-time employees.

6.      Plaintiff Erickson is an individual and a citizen of the State of Minnesota and the United States.  Erickson is the President and majority owner of both Dealerships. Erickson is a devout Christian and applies his faith to every area of his life, including his operation of the Dealerships.  The other shareholder/owners of the Dealerships, a group of six (6) individuals (including Erickson), share Erickson's sincerely-held Christian faith and likewise share Erickson's commitment to expressing Christian faith through operation of the Dealerships.

7.      As the President and majority shareholder of the Dealerships, Plaintiff Erickson establishes and approves the policies governing personnel and operational matters, and makes the executive decisions governing the operation of the Dealerships, specifically including decisions regarding the health care coverage provided by the Dealerships to employees.

8.      Defendant United States Department of Health and Human Services ("HHS") is an agency of the United States Government and is responsible for the administration and enforcement of the Mandate.

9.      Defendant Kathleen Sebelius is the Secretary of HHS.  As Secretary, she is responsible for the operation and management of HHS.  She is sued in her official capacity only.

10.     Defendant United States Department of Labor ("DOL") is an agency of the United States government and is responsible for the administration and enforcement of the Mandate.

11.     Defendant Thomas Perez is the Secretary of DOL.  As Secretary, he is responsible for the operation and management of DOL.  He is sued in his official capacity only.

12.     Defendant United States Department of the Treasury is an agency of the United States Government and is responsible for the administration and enforcement of the Mandate.

13.     Defendant Jacob Lew is the Secretary of the Treasury.  As Secretary, he is responsible for the operation and management of the Treasury.  He is sued in his official capacity only.

## JURISDICTION AND VENUE

14.     This action arises under the Constitution and laws of the United States. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.  This Court has jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 2000bb-1.  This Court has jurisdiction to award reasonable attorney's fees and costs under the Equal Justice Act, 28 U.S.C. § 2412, and 42 U.S.C. § 1988.

15.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e)(1) because the Plaintiffs reside and do business within this district.

## FACTUAL BACKGROUND

**A. Plaintiffs' History, Religious Beliefs, and Practices Related to Insurance for Abortion.**

16.     Hastings Automotive, Inc., which is known as Hastings Ford, has been serving the Hastings, Minnesota area for decades.  Erickson entered the car business immediately out of college when he went to work for Ford Motor Company at their Twin Cities office.  As he acquired more and more experience, Erickson was soon brought into the business at a large metro-area dealership.

17.     In 1989, Erickson purchased a sixteen percent (16%) share in the Hastings Ford dealership.  By 1992, he owned one-hundred percent (100%) of the business.  In 1998, he opened Hastings Chrysler Center, Inc. as the 90% shareholder and became the sole shareholder in 2004.

18.     Through the years, Erickson has brought other partners into the business. Each of them has a similar mindset on matters of faith and business.  Hastings Automotive, Inc. (Hastings Ford) is controlled by a group of four (4) men: Doug Erickson (60%), Joe Linder (30%), Bruce Spinks (5%), and Dan Plank (5%).  Hastings Chrysler Center, Inc. is controlled by a group of four men: Doug Erickson (55%), Joe Linder (20%), Bart Huppert (20%), and Eric Mech (5%).

19.     Erickson grew up attending Lutheran churches, but points to a period in the mid-1990's when he became a born-again Christian.  Because of his wife's involvement in Bible Study Fellowship, a world-wide interdenominational Bible Study organization, Erickson was challenged to study the Bible more closely as well.  He joined a men's

Bible study that provided him more instruction about his faith and what he believed as taught in Scripture.  As a result, through his study of the Bible and applying the lessons he learned from it to his life, Erickson saw his faith grow and saw changes in many areas of his life, such as improvements in his roles as a father and husband.

20.     At that time, Erickson considered selling the Dealerships as the businesses were struggling and Erickson was struggling to maintain them.  He decided instead to surrender the Dealerships to Christ, and dedicated himself to integrating faith and work. Erickson characterizes the work he does through the Dealerships as "marketplace ministry," by which he seeks to serve Christ first and foremost and show the light of Christ to those with whom he comes in contact, such as customers and employees.  Since Erickson dedicated the Dealerships to Christ, Plaintiffs have seen a marked improvement in customer satisfaction, employee engagement, and business performance.

21.     The operation of the Dealerships is a means by which Erickson and the other owners express their sincerely held religious beliefs.  Indeed, the Dealerships themselves share these sincerely held religious beliefs.

22.     Erickson's personal transformation is reflected in what became the corporate vision for the Dealerships.  That vision was built upon the principles of Erickson's faith, including the provision that the company would, "Demonstrate the heart of a servant."

23.     For Plaintiffs, servant leadership is best modeled by Jesus Christ.  That is why Plaintiffs offer the opportunity to, but do not require, all the Dealerships' employees to participate in a formal leadership program that explains the principles of servant

leadership.  More than 30% of all employees from various departments of the business have chosen to complete this leadership training.  The program refers to Jesus as the model and utilizes the Bible as part of the instruction provided to participants.

24.     As part of Plaintiffs' vision to integrate faith and work, Plaintiffs employ an ordained pastor who is available to provide pastoral services to employees.  The pastor is associated with the Evangelical Free Church of America and is known as, "Pastor of the Stores."

25.     For the past five or six years, Plaintiffs have had regular, voluntary prayer gatherings on the first Friday of every month.  Though participation in the gatherings is optional, several of Plaintiffs' employees choose to participate.

26.     Plaintiffs choose their marketing plans very carefully and direct their advertising dollars to advertising venues that share their religious convictions.  For instance, a substantial amount of advertising conducted by the Plaintiffs is done over the local Christian radio station, KTIS, in the form of exclusive on-air sponsorships.

27.     Plaintiffs support various Christian ministries, including Young Life, a non-denominational Christian ministry that reaches out to adolescents.  For the past four or five (4-5) years, the Dealerships have invested more than $10,000 of their profits in Young Life.  For more than seven (7) years, Plaintiffs have hosted fundraisers at the Dealerships for Young Life and have sponsored one of Young Life's fundraising golf tournaments.

28.     Plaintiffs make regular financial donations to Total Life Care Centers in Hastings, Minnesota, a non-profit, pro-life organization with multiple pregnancy resource

centers throughout Minnesota and Wisconsin.  Total Life Care Centers provide care for women and their families who are experiencing unplanned pregnancies, helping them choose life for their babies rather than abortion.  In addition, the Plaintiffs support the work of Total Life Care Centers as they help young women and their families manage their lives and succeed in their roles as parents.  The Dealerships host fundraising events at the Dealerships to assist the center located in Hastings, Minnesota.  Plaintiffs, personally and corporately, have supported Total Life Care Centers for the past six or seven (6 or 7) years and consider it a critical exercise of their sincerely-held Christian beliefs, specifically those beliefs that instruct Plaintiffs on the sanctity of human life.

29.     As part of their Christian faith, Plaintiffs believe that life begins at conception, and it is therefore a grave moral wrong to destroy a human embryo.

30.     Consequently, Plaintiffs believe that the use of what are labeled contraceptive, but have an abortifacient effect, is immoral and sinful because they destroy a human life by chemically inducing an abortion.

31.     In particular, Plaintiffs believe that use of emergency contraceptives, such as Plan B and ella, and certain intrauterine devices ("IUDs"), for which coverage is required by the Mandate, is immoral and sinful because these products are designed to destroy a human life shortly after that life has been conceived.

32.     Plaintiffs believe that it is immoral and sinful for them to pay for, provide access to, or otherwise support the use of these products through their coverage in the Dealerships' group health plan, as the Mandate requires.

33.    Plaintiffs believe that it is immoral and sinful to counsel a woman that the use of emergency contraceptives, abortifacient drugs, and certain IUDs is a viable birth-control option.

34.    Plaintiffs believe that it is immoral and sinful for them to pay for, provide access to, or otherwise support counseling that advises women that the use of emergency contraceptives, abortifacient drugs, and certain IUDs is a viable birth-control option.

35.    Erickson believes that his role as President and majority shareholder of the Dealerships is that of a steward of a business given to him by God and that his employees are God's children who are entrusted to his care.  He regards it as his religious duty to operate the Dealerships in conformity with his religious beliefs.

36.    Accordingly, Plaintiffs have provided health insurance to their employees since 1989.  Plaintiffs have provided health insurance to their employees through Preferred One since 2012.

37.    With the passage of the Affordable Care Act, Plaintiffs sought to clarify and confirm the scope of contraception coverage provided to employees by their health insurance plan.  Plaintiffs had always excluded abortion coverage from their insurance plans and believed their insurer provided a plan consistent with their moral beliefs. When the Affordable Care Act required the provision of contraceptives, Plaintiffs re-examined their coverage to determine precisely what was covered.  It took several months for the insurer to confirm that, while their plan previously had excluded abortion services, it also covered all FDA-approved contraceptives.  After several months of discussion between Plaintiffs and its insurer, it was determined that, because of the

Affordable Care Act, all FDA-approved contraceptives – including abortifacient drugs, such as Plan B, ella, and certain IUD's – were required to be covered by Plaintiffs in violation of Plaintiffs' sincerely held religious beliefs.

38.     The Mandate applied to Plaintiffs beginning July 1, 2013, because the Dealerships have more than fifty (50) full-time employees, do not qualify as a religious employer and are not entitled to the grandfather exemption.

39.     Because of the Mandate, Plaintiffs' current health insurance plan provides coverage for contraceptives and abortifacient drugs and related education and counseling in violation of Plaintiffs' sincerely held religious beliefs.  At renewal of its plan year on July 1, 2013, the Dealerships were forced to comply with the Mandate in violation of their sincerely-held religious beliefs.

**B.  The Affordable Care Act and the Mandate.**

40.     The Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119, requires group health plans to provide women with "preventative care and screenings" without cost sharing by the patient.  See U.S.C. § 300gg-13(a)(4).

41.     The ACA provides:

> A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for . . . (4) with respect to women, such additional preventative care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.

*Id.*

42.     The Health Resources and Services Administration ("HRSA") asked the

Institute of Medicine ("IOM"), an arm of the National Academy of Sciences, to

recommend which drugs, procedures, and services should be covered as preventative care

for women.

43.     IOM's report recommended, among other things, that the guidelines require

coverage for "the full range of Food and Drug Administration [FDA]-approved

contraceptive methods, sterilization procedures, and patient education and counseling for

women with reproductive capacity." Institute for Medicine, Clinical Preventive Services

for Women: Closing the Gaps (2011), available at

http://cnsnews.com/sites/default/files/documents/INSTITUTE%20OF%20MEDICINE-

PREVENTIVE%20SERVICES%20REPORT.pdf.

44.     HRSA adopted the IOM's recommendation.  See Health Resources and

Services Administration, Women's Preventative Services: Required Health Plan

Coverage Guidelines, http://www.hrsa.gov/womensguidelines (last visited Jan. 7, 2014)

(HRSA Guidelines).

45.     Defendants issued a final rule on February 15, 2012 mandating coverage

under the ACA for all FDA-approved contraceptive methods, sterilization procedures,

and patient education and counseling for women with reproductive capacity (the

"Mandate").  See 77 Fed. Reg. 8725.

46.     The FDA has approved twenty (20) contraceptive methods and sterilization

procedures, including IUD's and emergency contraceptives commonly known as Plan B

and ella.  FDA Office of Women's Health, *Birth Control Guide, available at*

http://www.fda.gov/downloads/ForConsumers/ByAudience/ForWomen/FreePublications/ UCM356451.pdf.

47.     These so-called emergency contraceptives and certain IUDs can, and often do, prevent the implantation of a human embryo and, thereby, can cause the unnatural, premature death of a developing human.  In other words, Plaintiffs believe that certain drugs and devices that the government has labeled as a "contraceptive" do not prevent conception; rather, it is Plaintiffs' religious belief that such drugs and devices act to induce a chemical abortion of a human life.  Thus, "emergency contraceptives," to the Plaintiffs, is a political misnomer of the government's creation.  Rather than a means to prevent the conception of a human life, Plaintiffs sincerely believe that Plan B, ella, and certain IUDs are abortifacients that immorally destroy a conceived human life.

48.     The ACA requires employers with more than fifty full-time employees to provide health insurance coverage that complies with the ACA and the Mandate or pay substantial fines and penalties.  See 26 U.S.C. § 4980H.

49.     For example, an employer who offers a health plan but does not comply with a portion of the ACA or the Mandate shall be taxed, "$100 for each day in the noncompliance period with respect to each individual to whom such failure relates."  26 U.S.C. § 4980D(b)(1).

50.     If an employer with more than fifty full-time employees fails to offer any health plan, the employer will be fined $2,000 per year per employee.  See 26 U.S.C. § 4980H(a).

51.     The requirement to offer a group health plan and the accompanying fine for failure to do so does not apply to employers with fewer than fifty (50) employees.  26 U.S.C. § 4980H(c)(2)(A).

52.     Certain provisions of the ACA do not apply to members of certain religious groups.  See, e.g., 26 U.S.C. § 5000A(d)(2)(a)(i) (stating that the individual mandate does not apply to members of a "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds); § 5000A(d)(2)(a)(ii) (stating that the individual mandate does not apply to members of a "health care sharing ministry" that meets certain criteria).

53.     The Mandate does not apply to preexisting health plans that are "grandfathered." 76 Fed. Reg. 46623 & n.4.

54.     The ACA creates a system of individualized exemptions because, under the ACA's authorization, the federal government has granted discretionary compliance waivers to a variety of for-profit businesses, unions, and other organizations for purely secular or political reasons.

55.     To date, HHS has granted over 1,000 individualized waiver requests to employers and insurance plans excusing them from compliance with the ACA.  *See* The Center for Consumer Information & Insurance Oversight, Annual Limits Policy: Protecting Consumers, Maintaining Options, and Building a Bridge to 2014, http://www.cms.gov/CCIIO/Resources/Files/approved_applications_for_waiver.html (last visited January 17, 2014).

56.     The Mandate does not apply to certain religious entities and individuals.

57.     The HRSA may establish exemptions for "religious employers." 45 C.F.R.

§ 147.130(a)(iv)(A).  HHS regulations define "religious employer" as "an organization

that meets all of the following criteria: (1) The inculcation of religious values is the

purpose of the organization.  (2) The organization primarily employs persons who share

the religious tenets of the organization.  (3) The organization serves primarily persons

who share the religious tenets of the organization. (4) The organization is a nonprofit

organization as described in section 6033(a)(1) and section 60343(a)(3)(A)(i) or (iii) of

the Internal Revenue Code of 1986, as amended."  45 C.F.R. § 147.130(a)(iv)(B).

58.     However, amended guidelines effective August 1, 2013, define, "religious

employer" as, "an employer that is organized and operates as a nonprofit entity and is

referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code."  78 Fed.

Reg. 39874 (July 2, 2013).  The referenced section of the Internal Revenue Code refers to

"churches, their integrated auxiliaries, and conventions or associations of churches" and

the "exclusively religious activities of any religious order."  26 U.S.C. § 6033(a)(3)(A)(i)

and (iii).

59.     In addition, Defendants have provided an accommodation for certain non-

exempt religious organizations.  See 78 Fed. Reg. 39874.

60.     An organization is eligible for the accommodation if it "(1) [o]pposes

providing coverage for some or all of the contraceptive services required to be covered

. . . on account of religious objections; (2) is organized and operates as a nonprofit entity;

(3) holds itself out as a religious organization; and (4) self-certifies that it satisfies the

first three criteria."  Id.

14

61.     No exemption or accommodation exists for for-profit organizations such as the Dealerships, even if they object to the Mandate based on sincerely held religious beliefs.

62.     The Mandate is not generally applicable because there are numerous exemptions from its rules and applicability.

63.     The Mandate is not neutral because many organizations and individuals, both secular and religious, are exempt from complying with the provisions of the ACA, including the Mandate, or have received individual compliance waivers exempting them from provisions of the ACA, including the Mandate.

64.     If Plaintiffs provided a group health plan that did not include coverage required by the Mandate, they would be subject to a tax of "$100 for each day in the noncompliance period with respect to each individual to whom such failure relates."  26 U.S.C. § 4980D(b)(1).

65.     If Plaintiffs provided no group health plan, they would be fined $2,000 per year per employee.

66.     The Mandate illegally and unconstitutionally forces Plaintiffs to violate their sincerely held religious beliefs concerning the sanctity of human life, contraception, and abortifacient drugs to avoid incurring substantial taxes, fines, and penalties. Compliance with the mandate would levy a substantial burden upon the exercise of religion by the Plaintiffs, causing irreparable harm and forcing them to abandon or act in derogation of their religious beliefs by providing insurance coverage for abortifacient

drugs and devices and counseling, education, and dissemination of information concerning same.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb

67.     Plaintiffs hereby incorporate by reference, paragraphs 1 through 66, as though fully set forth herein.

68.     Plaintiffs are persons exercising religion under, and within the meaning of, the Religious Freedom Restoration Act, 42, U.S.C. § 2000bb ("RFRA").

69.     Plaintiffs' sincerely held religious beliefs prohibit them from purchasing, providing coverage for, or otherwise supporting the use of certain contraceptives, abortifacient drugs, and related education and counseling in their employee group health plan.

70.     When Plaintiffs adhere to Christian Biblical teachings with regard to contraceptives, abortifacient drugs, and related education and counseling, they exercise religion within the meaning of the RFRA.

71.     The Mandate coerces Plaintiffs to change or violate their sincerely held religious beliefs by requiring them to purchase, provide coverage for, or otherwise support the use of certain contraceptives, abortifacient drugs, and related education and counseling in their employee group health plan.

72.     By not complying, the Mandate inflicts substantial taxes, fines, and penalties on Plaintiffs for exercising their sincerely held religious beliefs.

73.     The Mandate imposes a substantial burden on Plaintiffs' exercise of their religion.

74.     The Defendants' exemption of certain, and many, groups from the requirements of the Mandate together with their failure to accommodate Plaintiffs' religious beliefs is highly selective, arbitrary, and discriminatory.

75.     The Mandate furthers no compelling government interest.

76.     The Mandate is not narrowly tailored to any alleged compelling government interest.

77.     The Mandate is not the least restrictive means of furthering any alleged compelling government interest.

78.     The Mandate violates RFRA.

79.     Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT II

### Violation of the Free Exercise Clause of
### the First Amendment to the United States Constitution

80.     Plaintiffs hereby incorporate by reference, paragraphs 1 through 79, as though fully set forth herein.

81.     Plaintiffs' sincerely held religious beliefs prohibit them from purchasing, providing coverage for, or otherwise supporting the use of certain contraceptives, abortifacient drugs, and related education and counseling in their employee group health plan.

82.     When Plaintiffs adhere to Christian Biblical teachings with regard to contraceptives, abortifacient drugs, and related education and counseling, they exercise religion within the meaning of the Free Exercise Clause of the First Amendment.

83.     The Mandate is not neutral and is not generally applicable.

84.     Defendants have created categorical and individualized exemptions to the Mandate.

85.     The Mandate furthers no compelling government interest.

86.     The Mandate is not the least restrictive means of furthering any alleged government interest, nor is it narrowly tailored to any alleged government interest.

87.     The Mandate coerces Plaintiffs to change or violate their sincerely held religious beliefs.

88.     Compliance with the Mandate imposes a substantial burden on Plaintiffs' exercise of their religion by forcing Plaintiffs to purchase, provide coverage for, or otherwise support the use of certain contraceptives, abortifacient drugs, and related education and counseling in their employee group health plan in violation of their sincerely held religious beliefs.

89.     Noncompliance with the Mandate imposes substantial taxes, fines, and penalties on Plaintiffs for exercising their religious beliefs.

90.     The Mandate is designed to apply to some religious individuals but not to others, resulting in discrimination among religions.

91.     The Mandate permits HRSA unlimited discretion to decide to exempt some, all, or no organizations meeting the definition of "religious employers."

18

92.     Defendants have provided exemptions to the Mandate for some religious individuals but not others based on characteristics of their beliefs and the manner in which they exercise them.

93.     Defendants designed the Mandate and the religious exemption in a way that makes it impossible for Plaintiffs to comply with their religious beliefs.

94.     Defendants created both the Mandate and the religious exemption with the purpose and intent to suppress Plaintiffs' religious exercise.

95.     The Mandate violates Plaintiffs' rights under the Free Exercise Clause of the First Amendment to the United States Constitution.

96.     Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT III

### Violation of the Establishment Clause of
### the First Amendment to the United States Constitution

97.     Plaintiffs hereby incorporate by reference, paragraphs 1 through 96, as though fully set forth herein.

98.     Plaintiffs' sincerely held religious beliefs prohibit them from purchasing, providing coverage for, or otherwise supporting the use of certain contraceptives, abortifacient drugs, and related education and counseling in their employee group health plan.

99.     The First Amendment's Establishment Clause prohibits the establishment of any religion as well as excessive government entanglement with religion.

100.    The Establishment Clause requires that the government remain neutral in all matters of religion.

101.    The Mandate requires Defendants to examine Plaintiffs' religious beliefs to determine whether they are sufficiently religious to qualify for the exemption or whether they must comply with the Mandate.

102.    This examination requires continuous surveillance of Plaintiffs' religious exercise, causing an impermissible degree of entanglement with religion in violation of the Establishment Clause.

103.    The Mandate discriminates between religions and denominations and exhibits hostility to religious beliefs.

104.    The Mandate adopts a particular view of what is acceptable moral complicity in provision of contraceptive and abortifacient-drug coverage and imposes it upon all religious individuals who must either conform to the mandate's view or suffer penalties.

105.    The Mandate violates Plaintiffs' rights under the Establishment Clause of the First Amendment to the United States Constitution.

106.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT IV

### Violation of the Free Speech Clause of the First
### Amendment to the United States Constitution – Compelled Speech

107.   Plaintiffs hereby incorporate by reference, paragraphs 1 through 106, as though fully set forth herein.

108.   A business's conduct and speech relating to the provision of an employee health plan is "speech" protected by the Free Speech Clause of the First Amendment.

109.   Expenditures of money are a form of protected speech.

110.   Plaintiffs' sincerely held religious beliefs prohibit them from purchasing, providing coverage for, or otherwise supporting the use of certain contraceptives, abortifacient drugs, and related education and counseling in their employee group health plan.

111.   The Mandate's requirement that all group health plans provide coverage for patient education and counseling in relation to contraceptives, sterilization, and abortifacient drugs forces Plaintiffs to subsidize speech and expressive conduct that is directly contrary to Plaintiffs' religious beliefs.

112.   The Mandate furthers no compelling government interest.

113.   The Mandate is not narrowly tailored to any alleged compelling government interest, nor is it the least restrictive means of furthering any alleged government interest.

114.   As a result of the aforementioned violations of the Free Speech Clause of the First Amendment, the Mandate is facially invalid.

115.    As a result of the aforementioned violations of the Free Speech Clause of the First Amendment, the Mandate is invalid as applied.

116.    The Mandate violates Plaintiffs' rights under the Free Speech Clause of the First Amendment to the United States Constitution.

117.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT V

**Violation of the Free Speech Clause of the First
Amendment to the United States Constitution – Expressive Association**

118.    Plaintiffs hereby incorporate by reference, paragraphs 1 through 117, as though fully set forth herein.

119.    The Free Speech Clause of the First Amendment to the United States Constitution protects Plaintiffs' right to expressive association.

120.    Plaintiffs profess and support in their community the message and belief that life begins at conception and that the use of so-called emergency contraceptives, abortifacient drugs, and certain IUDs violate their sincerely held religious beliefs.

121.    The Mandate would compel Plaintiffs to provide, subsidize, fund, or participate in the provision or subsidization of the very activities that Plaintiffs profess to be violations of their religious beliefs.

122.    The Mandate would compel Plaintiffs to provide, subsidize, fund, or participate in the provision or subsidization of so-called emergency contraceptives, abortifacient drugs, certain IUDs, and related education and counseling.

123.    Defendants' actions thus violate Plaintiffs' rights to expressive association under the Free Speech Clause of the First Amendment to the United States Constitution.

124.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT VI

### Violation of the Fifth Amendment to the United States Constitution

125.    Plaintiffs hereby incorporate by reference, paragraphs 1 through 124, as though fully set forth herein.

126.    The Fifth Amendment to the United States Constitution provides that the government shall not deprive any person of life, liberty, or property, without due process of law and implicitly ensures equal protection of the law to all people.

127.    Under the Fifth Amendment, the government must remain neutral in matters of religion and religious organization.

128.    The Mandate discriminates between religions and denominations and exhibits hostility to religious beliefs.

129.    The Mandate requires Defendants to examine Plaintiffs' religious beliefs to determine whether they are sufficiently religious to qualify for the exemption or whether they must comply with the Mandate.

130.    For-profit companies and their owners, no matter how religious, are not included in the exemption to the ACA or the Mandate.

131.    While a church and its pastor are exempt from the Mandate, a lay person who owns a for-profit company and his or her company are not exempt, despite the fact

that they hold the same religious beliefs and objections to the Mandate as the church and its pastor.

132.    Thus, the exemption unconstitutionally discriminates in favor of some religious persons and entities and against others.

133.    The government's discrimination between different religious individuals and entities is a violation of the Fifth Amendment's due process, equal protection, and neutrality requirements.  The Mandate does not treat each similarly situated religious objector equally under the law.  The government is unconstitutionally favoring religious objectors who are clergy or entities organized as a church over those who are lay people who own for-profit businesses or entities organized as a for-profit business.

134.    As a result of the aforementioned violations under the Fifth Amendment, the Mandate is facially invalid.

135.    As a result of the aforementioned violations under the Fifth Amendment, the Mandate is invalid as applied.

136.    The Mandate violates Plaintiffs' rights to due process and equal protection under the Fifth Amendment to the United States Constitution.

137.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## PRAYER FOR RELIEF

1.    WHEREFORE, Plaintiffs request a jury trial on the claims presented herein and request that the Court:

2.      Declare that the Mandate and its application to Plaintiffs violate the

Religious Freedom Restoration Act;

3.      Declare that the Mandate and its application to Plaintiffs violate the Free

Exercise  Clause of the First Amendment to the United States Constitution;

4.      Declare that the Mandate and its application to Plaintiffs violate the

Establishment Clause of the First Amendment to the United States Constitution;

5.      Declare that the Mandate and its application to Plaintiffs violate the Free

Speech Clause of the First Amendment to the United States Constitution;

6.      Declare that the Mandate and its application to Plaintiffs violate the Fifth

Amendment to the United States Constitution;

7.      Issue both preliminary and permanent injunctions prohibiting Defendants

from applying the Mandate to and enforcing the Mandate against Plaintiffs;

8.      Declare that an insurance issuer that offers a group health plan to Plaintiffs

that excludes the coverage required by the Mandate does not violate the ACA or the

Mandate;

9.      Award Plaintiffs' costs and reasonable attorney fees;

10.     Award such other relief as the Court deems just.

January 29, 2014                    LIBERTY INSTITUTE


By:   /s/ Kathryn M. Nash
        Kathryn M. Nash (MN Bar No. 0312496)
        Meghann F. Kantke (MN Bar No. 0391270)
        Pamela Kovacs (MN Bar No. 0394817)
        Volunteer Attorneys, Liberty Institute
        80 South Eighth Street, Suite 500
        Minneapolis, MN 55402
        Telephone:  (612) 632-3000
        Facsimile:   (612) 632-4444
        kathryn.m.nash@gmail.com
        mekantke@gmail.com
        pamelajkovacs@yahoo.com



        Jeff Mateer, (TX Bar No.: 13185320)
        General Counsel, Liberty Institute
        Jeremiah G. Dys (W. Va Bar No.: 9998)
        Senior Counsel, Liberty Institute
        2001 Plano Parkway, Suite 1600
        Plano, TX 75075
        jmateer@libertyinstitute.org
        jdys@libertyinstitute.org

        **ATTORNEYS FOR PLAINTIFFS**

## VERIFICATION OF COMPLAINT

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on ___JAN 28___, 2014

Douglas W. Erickson

I declare on behalf of Hastings Automotive, Inc. under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on ___JAN 28___, 2014

Hastings Automotive, Inc.

By: Douglas W. Erickson
Its President

I declare on behalf of Hastings Chrysler Center, Inc. under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on ___JAN 28___, 2014

Hastings Chrysler Center, Inc.

By: Douglas W. Erickson
Its President

GP:3576741 v4



**Ann Marie Patzke**
NOTARY PUBLIC
STATE OF MINNESOTA
My Commission Expires 1-31-2015

27